**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

BETTY KOWALUK,                    )
                                  )
                    Plaintiff,    )          Civil Action No. 08-0005
                                  )
          vs.                     )
                                  )          Magistrate Judge Lenihan
MICHAEL J. ASTRUE,                )
COMMISSIONER OF                   )
SOCIAL SECURITY,                  )          Re: Doc. Nos. 12 & 14
                                  )
                    Defendant.    )


<u>**MEMORANDUM OPINION AND ORDER**</u>

        This is an action timely filed under the Social Security Act, 42 U.S.C. § 405 (g), to

review a final decision of the Commissioner of Social Security finding that although Plaintiff,

Betty Kowaluk has the severe impairments of bilateral hand neuralgias, migraine headaches,

cervical strain, meningioma, benign vertigo, optic neuritis, degenerative disc disease and small

disc herniation at C6-7, restless leg syndrome and gastroesophageal reflux disease (Tr. 17,

Finding No. 3), she has the residual functional capacity to perform medium work activity,

limited to the following:

>       [O]ccasional walking and standing six hours our of an eight-hour day, is limited
>       to occasional postural maneuvers such as balancing, stooping, kneeling,
>       crouching, crawling and climbing ramps and stairs, must avoid concentrated
>       exposure to fumes, odors, dusts, gases, environments with poor ventilation,
>       temperature extremes, excessive vibration, extreme dampness and humidity and is
>       limited to occupations which do not require exposure to dangerous machinery,
>       unprotected heights or operation of a motor vehicle during work hours.

(Tr. 18, Finding No. 5).  Plaintiff seeks Disability Insurance Benefits (DIB) pursuant to Title II

of the Social Security Act, and Supplemental Security Income (SSI) pursuant to Title XVI of the

Social Security Act. To obtain DIB, plaintiff must show that she became disabled on or before

the date she was last insured; in this case, she was insured through December 31, 2010. (Tr. 17,

Finding No. 1.) The issue presented by this appeal is whether there is substantial evidence to

support the Commissioner's findings. 42 U.S.C. § 405 (g). Both parties have filed motions for

summary judgment.


I.      PROCEDURAL BACKGROUND

On February 17, 2006, Plaintiff protectively filed both DIB and SSI applications. (Tr.

30.) She alleged that she became disabled on November 20, 2005. Her application was initially

denied, and Plaintiff timely filed a request for hearing on November 19, 2006. (Tr. 30.) A

hearing was held on May 10, 2007. (Tr. 27-55.) Plaintiff testified at the hearing and was

represented by counsel of record. A vocational expert also appeared and testified. On May 25,

2007, the ALJ rendered a decision denying Plaintiff's applications for benefits. (Tr. 15-22.)

Plaintiff's Request for Review of Hearing/Decision Order was denied by the Appeals Council.

Thereafter, the decision of the ALJ became the final decision of the Commissioner. (Tr. 6-9.)

Having exhausted all administrative remedies, Plaintiff filed this Complaint in the United States

District Court for the Western District of Pennsylvania.


II.     RELEVANT FACTS

On January 16, 2004, Plaintiff presented to Westmoreland Regional Hospital with neck

and back pain after injuring her left shoulder when she fell on the ice. (Tr. 151.) She was

diagnosed with cervical back strain, low back strain and contusion of the left shoulder. (Tr.

152.)  Plaintiff's range of motion was full, although the physical examination revealed some

neck and lumbar spine tenderness and spasm.  (Tr. 151.)  X-rays demonstrated mild cervical

degenerative changes at C6-7, and minimal degenerative changes of the lumbar spine.  (Tr. 153-

54.)

In May 2004, Plaintiff began physical therapy to address complaints of pain in the left

neck/shoulder area when reaching and picking up objects.  At her May 6, 2004 physical therapy

appointment Plaintiff reported that after her fall on the ice in January 2004, muscle relaxants had

relieved her pain until about three weeks prior.  (Tr. 160.)  Plaintiff received eight physical

therapy sessions consisting of moist heat, ultra sound, massage/manual therapy and therapeutic

exercise.  She was also instructed in an exercise program to be performed at home.  (Tr. 158.)

Her pain level had decreased and she "returned to [her] previous home/work related chores with

minimal to no pain."  (Tr. 158.)  The physical therapy discharge report noted that "[p]atient had

an excellent outcome as a result of this brief course of care."  (Tr. 158.)

In July 2004, Plaintiff was admitted overnight to Westmoreland Regional Hospital

complaining of chest pain.  (Tr. 170-71.)  A cardiac catheterization was normal and it was

concluded that Plaintiff's chest pain was secondary to gastroenteritis and gastritis.  (Tr. 171, 190-

91.)  Plaintiff was discharged with instructions to rest, drink plenty of fluids and begin Prevacid

and Zyrtec.  (Tr. 172.)

In July 2005, Plaintiff presented to Dr. David Richards with gastroesophageal reflux

disease and seasonal allergies.  (Tr. 235.)  Dr. Richards noted that her conditions have been well

controlled with Prevacid and Zyrtec.  He indicated that she offered "no other complaints."  (Tr.

235.)

In November 2005, Plaintiff presented to Dr. John Nairn for glaucoma evaluation. (Tr. 200.) Dr. Nairn's exam revealed that Plaintiff's central visual acuity with best correction was 20/20 bilaterally, and no surgery was contemplated. (Tr. 200.) There were, however, clinical signs of visual field restriction. (Tr. 200.) He described her prognosis as good and she was to return in one year to repeat visual field testing. (Tr. 201.)

In January 2006, Plaintiff again saw Dr. Richards with complaints of fatigue, decreased energy, and pain in her legs and hands. (Tr. 234.) Physical examination revealed decreased sensation in her right leg, but she had adequate strength in her upper and lower extremities. He also noted "[q]uestionable history of optic neuritis," and fatigue. (Tr. 234.) A CT scan of the brain revealed a probable small meningioma[1] but no evidence of bleeding, acute infarct, or edema. (Tr. 212, 234, 275.) Dr. Richards also indicated on an Employability Assessment Form for the Pennsylvania Department of Public Welfare that Plaintiff was temporarily disabled from January 1, 2006 through May 1, 2006 due to optic neuritis and myalgia[2]. (Tr. 233.) On February 6, 2006, an MRI of the brain revealed a high left mid-posterior frontal meningioma. (Tr. 213-14.)

On April 7, 2006, Dr. Richards wrote to Dr. Michael Sauter referring Plaintiff to his care. Dr. Richards stated, in part, as follows:

> Her symptoms were nonspecific, including fatigue, and a burning sensation in her hands and anterior legs. By her history, she described a report of optic neuritis in 1994. She's had MRI and lumbar puncture done in the distant past that were non-

---

[1]A meningioma is a benign, slow-growing tumor or the meninges, the three membranes that envelop the brain and spinal cord. Dorland's Illustrated Medical Dictionary 1149 (31st ed. 2007) (hereinafter "Dorland's at ___").

[2]Myalgia is pain in a muscle or muscles. Dorland's at 1233.

diagnostic for MS.  She continues to complain of fatigue and discomfort, and I've offered her a reevaluation and work up.  I did grant her short-term disability until this work up was completed.

We proceeded with an MRI of the brain, B12, folate, and other labs, all of which were unremarkable.  Her physical exam did not demonstrate any clear signs of upper motor neuron disease. . . . There was a concern of a possible meningioma, which was likely an incidental finding.

At this point her physical exam remains fairly good, with good intact DTRs and normal gait.  There are no obvious motor or sensory deficits.  She requested further extension of her disability.  I did not feel that there was anything objective that could support that.

(Tr. 229.)

On June 22, 2006, Plaintiff presented to Dr. Sauter with complaints of hand tingling, a six month history of proximal bilateral upper and lower extremity burning pain, migraines, and neck pain.  (Tr. 237.)  She experienced increased fatigue with minimal activity, and increased blurred vision in the right eye since October 2005 with a negative evaluation for glaucoma.  (Tr. 237.)  Neck examination revealed no Spurling's or Lhermitte's[3] signs.  (Tr. 237.)  She had a positive Tinel's sign[4] at the left wrist, and mild hand paresthesias[5].  (Tr. 237-38.)  Dr. Sauter's impression was as follows:

The patient presents with cervical strain and hand neuralgia and blurred vision with a previous history of optic neuritis.  The plan is to check a cervical spine MRI and an evoked potential series for demyelination.  She has been referred to physical therapy for TENS unit application.  Office follow-up for an upper and lower extremity EMG in 6 weeks.

_____

[3]Lhermitte's sign is the development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward; seen mainly in multiple sclerosis but also in compression and other disorders of the cervical cord.  Dorland's at 1738.

[4]Tinel's sign occurs when there is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve.  Dorland's at 1741.

[5]Paresthesia is an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus.  Dorland's at 1404.

(Tr. 238.)  The cervical spine MRI in July 2006, revealed mild osteophyte formation at C6-7, with an annular tear and a small broad-based posterior subligamentous disc herniation, without significant encroachment of the spinal canal.  (Tr. 207.)  The nerve conduction studies for demyelination[6] yielded normal results for both the upper and lower extremities.  (Tr. 279.)

Also in July 2006, Plaintiff began physical therapy.  (Tr. 292-93.)  The assessment made at the initial evaluation was as follows:

> [R]educed active/passive range of motion of bilateral shoulders, cervical and trunk/lumbar spine, reduced strength to bilateral shoulders with positive cogwheel effect, alteration in gait pattern with reduced mobility of left hip, postural deficits, positive myofascial tone/spasm to musculature of the left upper trapezius, cervical spine, and scapula, reduced acuity to sharp sensation to the palmar aspect of the digits of the left hand and just above the level of the wrist, and reduced strength to the left lower extremity.

(Tr. 293.)  After 19 aquatic sessions, Plaintiff reported that pain fluctuated on a daily basis, although her pain rating after therapy decreased.  (Tr. 290.)  Discontinuation of formal services was recommended.  (Tr. 290.)  It was also recommended that Plaintiff continue water therapy on her own to manage "her chronic pain."  (Tr. 290.)

On August 18, 2006, state agency physician Nghia Van Tran, M.D., assessed Plaintiff's physical residual functional capacity.  (Tr. 253-56.)  Dr. Van Tran, after a review of the medical evidence, concluded that Plaintiff could perform the full range of work at the light exertional level.  (Tr. 253-59.)

On October 27, 2006, Plaintiff returned to the offices of Dr. Sauter for a follow-up visit with Dr. Joseph Zayat.  (Tr. 277-79.)  The sensory exam revealed decreased sensation in the left

---

[6]Demyelination is the destruction, removal or loss of the myelin sheath of a nerve or nerves.  Dorland's at 493.

lower extremity. (Tr. 277.) Dr. Zayat noted that she walked with a stiff posture and gait was narrow-based. (Tr. 277.) His impression was benign paroxysmal positional vertigo, migraine headaches, and cervicalgia, secondary to herniated disc disease at C6-7, and meningioma. (Tr. 277.) He counseled Plaintiff as to the meningioma, as this was giving her concern, explaining "that it was too small to cause any problem." (Tr. 277.) He discontinued Flexeril, started Zanaflex, prescribed a soft cervical collar for two weeks, and exercises. (Tr. 277.) Electromyography studies were normal for both upper and lower extremities. (Tr. 279.) Specifically, as to impression, Dr. Zayat indicated that "[t]he above study shows no abnormalities as this is just peripheral neuropathy[7] or proximal cervical or lumbar motor neuropathy." (Tr. 279.)

On November 21, 2006, Plaintiff presented to Dr. Gregg Goldstrohm with recurrent reflux symptoms. (Tr. 271.) He recommended Protonix, as Prilosec and Pepcid have offered no relief. (Tr. 271.) At a follow-up visit, Plaintiff reported that she was about 75% better on the Protonix. (Tr. 270.)

On November 27, 2006, Plaintiff presented again to Dr. Goldstrohm after having been in a motor vehicle accident. (Tr. 261.) Her left hand was injured when an air bag imploded. Dr. Goldstrohm ordered an MRI which showed some marrow edema of the third and fourth metacarpals. (Tr. 260.) He believed that the injury was more of a contusion. Plaintiff had less tenderness in her hand, but still had limitation of motion and flexion. (Tr. 260.) Dr. Goldstrohm prescribed therapy for range of motion, strengthening, and desensitization. (Tr. 260.)

---

[7]Neuropathy is a functional disturbance or pathological change in the peripheral nervous system. Dorland's at 1287.

In December 2006, Plaintiff was initially evaluated at Keystone Rehabilitation for occupational therapy involving the contusion of her left hand. (Tr. 263-64.) The assessment indicated that Plaintiff had a limited range of motion, limited strengths, variable increased edema, and limited functional use. Potential for rehabilitation was indicated as good. (Tr. 265.)

The facility director recommended a course of nine visits to increase strength and control edema. (Tr. 265.) After nine occupational therapy treatments, Plaintiff made significant improvements in all areas and she indicated she was pleased with her progress. (Tr. 262.) She reported minimal pain, and that she was "doing everything" with her hand. (Tr. 262.) Plaintiff was discharged with 100% functional status, achieving all preset goals. (Tr. 263.)

Plaintiff again presented to the office of Drs. Sauter and Zayat on January 5, 2007, complaining of headaches, and numbness in the tips of her fingers, mostly in the left hand. (Tr. 316.) She reported that her vertigo and neck pain had decreased. (Tr. 316.) A physical exam revealed no neck lymph nodes or tenderness, and normal range of motion of the cervical spine. (Tr. 316.) Her gait was normal, and no muscle atrophy, weakness, or pronator drift was observed. (Tr. 316.) Sensation was diminished in the distal distribution of the median nerve bilaterally, and Tinel's sign was positive on the left only. (Tr. 316.) Phalen's maneuver[8] was negative bilaterally. (Tr. 316.) Dr. Zayat diagnosed migraines, cervicalgia, and carpal tunnel. In addition, he prescribed medications, a soft cervical collar, wrist braces, and an EMG of both upper extremities. (Tr. 316.)

---

[8]Phalen's maneuver is used for the detection of carpal tunnel syndrome. Dorland's at 1117.

The EMG and nerve conduction studies of both upper extremities were performed in March 2007.  (Tr. 323-24.)  The results were "essentially normal," revealing no evidence of a compressive neuropathy at the wrist or elbow of either arm.  (Tr. 324.)  Surgical exploration was not advised.  (Tr. 324.)  The final paragraph of the report, however, provided as follows:

> EMG/NCV testing can only test motor and sensory nerve fibers involved with touch, pressure, and vibration.  The smaller nerve fibers conveying pain cannot be tested.  Therefore a normal study does not exclude the possibility of mild radiculopathy, myofascial pain syndrome, or other causes of pain or numbness.

(Tr. 324.)

On April 25, 2007, Dr. Sauter prepared a Physical Capacities Evaluation.  (Tr. 283-87.)  Dr. Sauter indicated that he believed Plaintiff could sit for up to eight hours, stand up to six hours, walk up to six hours, and drive for six hours in an eight-hour workday.  (Tr. 283.)  He also indicated that Plaintiff could lift up to 50 pounds occasionally and 20 pounds frequently, that she could use both hands for repetitive actions such a s simple grasping, pushing and pulling, and fine manipulation.  (Tr. 283.)  Further, he indicated that Plaintiff could occasionally perform all postural movements, including reaching above shoulder level, but she could not be exposed to moving machinery and had a moderate restriction regarding exposure to unprotected heights.  She also required no exposure to marked changes in temperature and humidity, and to dust, fumes, and gases.  (Tr. 283.)  The evaluation further indicated that Plaintiff had no objective signs of pain such as redness, muscle spasm, or joint deformity, and her pain was mild.  (Tr. 284.)  He indicated that Plaintiff would occasionally need to rest during the day and occasionally miss work due to exacerbations of pain.  (Tr. 284.)

Finally, Dr. Sauter noted that Plaintiff's lumbar range of motion was normal.  He further noted that her cervical range of motion was normal other than some limitation noted with neck

extension and rotation. (Tr. 285.) Dr. Sauter also noted less complaint of neck pain and headache, and no wasting of intrinsic hand muscles. His prognosis was good for full recovery. (Tr. 287.)

HEARING TESTIMONY

On May 10, 2007, Plaintiff testified at the administrative hearing. At the time of the hearing, she indicated that she was 51 years old, single, and living with her boyfriend. She testified that she does not drive and does not have a driver's license. (Tr. 31.) She completed up to the eleventh grade in high school and obtained her GED. (Tr. 32.) She indicated that she watches five to six hours of television a day and has no difficulty following the programs. (Tr. 32.) Her current source of income is welfare. She last worked as a manager at Food Land and quit her job on November 20, 2005 because of her health. (Tr. 33-34.)

As to her medications, she testified that she takes Imitrex nasal spray for migraines, Prevacid, and only over-the-counter Tylenol for pain. (Tr. 35-36.) She wore her arm braces to the hearing and testified that she wears them a couple of hours each day to help control the tingling. (Tr. 36-37.) She indicated that she has worn a cervical collar since October of 2006, and wears it two to three times per week for neck pain. (Tr. 37.) She indicated that standing aggravates her lower back and that is why she believes she is unable to work. (Tr. 37.) She also indicated that she gets headaches everyday, and that she will be down for two to three days when she has a severe migraine. (Tr. 38.) She testified that she takes Tylenol every night, and sometimes during the day. (Tr. 38.)

She indicated that she can walk about four blocks, stand for no more than a half hour to 45 minutes, sit for two hours, and carry five pounds. (Tr. 38-39.) She has to rest intermittently

10

when cooking, and doing dishes.  She vacuums and dusts in moderation, and also has to rest

intermittently.  She grocery shops twice a month.  She does no outside work, but is able to feed

her cat.  She occasionally visits friends and relatives.  She likes to read and knit but can only do

those things for short periods of time because her hands and neck begin to hurt.  She will go to

the mall for only an hour at a time.  (Tr. 39.)  She indicated she has restless leg syndrome that

interferes with her sleep.  (Tr. 41.)  She described her vertigo symptoms and that she had been

experiencing them everyday for the past 6 weeks.  (Tr. 42-43.)  She also described her symptoms

of hand neuralgia and how she has tingling that causes her to drop things.  (Tr. 44-45.)  Her

carpal tunnel causes her hands to ache about 4 times per week.  She  described the pain she gets

from her herniated disc, for which she wears a cervical collar.  The pain radiates into her

shoulders and down her arms.  (Tr. 45-46.)

A vocational expert (VE) also testified.  (Tr. 49-54.)  The ALJ asked the VE the

following hypothetical:

> Assume if you [were] an individual who is of the age, education, and work
> experience of the Claimant.  Who could sit for eight hours.  Stand, walk, or drive
> for six hours.  Lift and carry ten pounds occasionally.  Who could perform
> occasional postural maneuvers such as balancing, stooping, kneeling, crouching,
> and crawling.  And climbing ladders – or strike that – ramps and stairs.  Who
> would need to avoid concentrated exposure to fumes, odors, dust, gasses,
> environments with poor ventilation, temperature extremes, excessive vibration,
> extreme dampness and humidity.  This individual should avoid exposure to
> dangerous machinery and unprotected heights, and the operation of a motor
> vehicle.  Could this hypothetical individual perform any of the jobs the Claimant
> has performed in the past?

(Tr.50.)  The VE responded that Plaintiff could perform her past work of administrative assistant,

and executive secretary.  (Tr. 50.)  The VE also testified that there would be other medium or

light jobs that she could perform such as ticket printer, embossing machine operator; scales

operator, grader, hand packer, binder or packer, janitorial aide, and food sorter. (Tr. 51-52.) The VE also indicated that omitting driving from the above hypothetical would not change the above job selections. (Tr. 52.)

III.   LEGAL STANDARD

The standard of judicial review is whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401; Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552 (1988)); Smith, 637 F.2d at 970; Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir. 1979). "Substantial evidence" is more than a "scintilla." Jesurum v. Secretary of United States Dep't of Health and Human Servs., 48 F.3d 114, 117 (3d Cir. 1995); Stunkard v. Secretary of Health and Human Servs., 841 F.2d 57, 59 (3d Cir. 1988); Smith, 637 F.2d at 970. If supported by substantial evidence, the Commissioner's decision must be affirmed.

The Supreme Court has described a five-part test established by the Commissioner to determine whether a person is disabled: The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c) (1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (1989). If the claimant's impairment matches or is

"equal" to one of the listed impairments, he qualifies for benefits without further inquiry.

§ 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the

fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past

work or any other work that exists in the national economy, in view of his age, education, and

work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

§§ 416.920(e) and (f). Sullivan v. Zebley, 493 U.S. 521, 525-26 (1990). Accord Barnhart v.

Thomas, 540 U.S. 20, 25 (2003). The initial burden rests with Plaintiff to demonstrate that he is

unable to engage in his past work. Stunkard, 841 F.2d at 59; Cotter v. Harris, 642 F.2d 700 (3d

Cir. 1981); Dobrowolsky, 606 F.2d at 406; Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979).

The burden then shifts to the Commissioner to show that other work exists in the national

economy that he could perform. Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984). The

fifth step is divided into two parts:

> First, the [Commissioner] must assess each claimant's present job
> qualifications. The regulations direct the [Commissioner] to
> consider the factors Congress has identified as relevant: physical
> ability, age, education, and work experience. See 42 U.S.C.
> § 423(d)(2)(A); 20 C.F.R. § 404.1520(f) (1982). Second, [he]
> must consider whether jobs exist in the national economy that a
> person having the claimant's qualifications could perform. 20
> C.F.R. §§ 404.1520(f), 404.1566-404.1569 (1982).

Heckler v. Campbell, 461 U.S. 458, 460-61 (1983) (footnotes omitted).

Plaintiff presents a four-pronged argument in support of her Motion for Summary

Judgment: 1) "The ALJ erred in his determination that [P]laintiff's statements concerning the

intensity, persistence, and limiting effects of her symptoms were not entirely credible" in that he

failed to properly apply the appropriate legal standard to Plaintiff's symptoms and functional

limitations; 2) The ALJ failed to properly evaluate Plaintiff's treating physician and examining

13

medical source evidence; 3) "The ALJ's failure to properly consider the severity of [P]laintiff's medical condition impaired his analysis at step three of the inquiry," based in part on his errors described at Numbers 1 and 2 above; and 4) Because the ALJ erred in his characterization of Plaintiff's residual functional capacity, the VE's responses to the ALJ's hypothetical questions are not supported by substantial evidence.

IV.   ANALYSIS

A.   The ALJ Properly Assessed Plaintiff's Statements concerning the Intensity, Persistence, and Limiting Effects of her Symptoms pursuant to 20 C.F.R. § 404.1529, 416.929, and SSR 96-7p.

The ALJ's finding that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible" is supported by substantial evidence. (Tr. 20.)  The ALJ followed the two step process described in SSR 96-7p.  First, the ALJ must consider whether there is an underlying medically determinable physical impairment; that is, one that can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the Plaintiff's pain and other symptoms.  Thereafter, the ALJ must evaluate the intensity, persistence, and limiting effects of the Plaintiff's symptoms to determine whether they limit Plaintiff's ability to do basic work activities.  Because Plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain and other symptoms are not substantiated by the objective medical record evidence, the ALJ must consider the entire case record including medical signs and laboratory findings, Plaintiff's own statements about her symptoms, statements and other information provided by treating or examining physicians, and other persons about Plaintiff's symptoms and how they affect her, and "any other

14

relevant evidence in the case record." <u>See</u> SSR 96-7p. 20 C.F.R. 404.1529(c) and 416.929(c) which describe the kinds of evidence that an ALJ must consider in addition to the objective medical evidence when evaluating the credibility of Plaintiff's statements as follows:

1. Plaintiff's daily activities;

2. The location, duration, frequency, and intensity of Plaintiff's pain or other symptoms;

3. Factors that aggravate or precipitate Plaintiff's symptoms;

4. The type, dosage, effectiveness, and side effects of medication Plaintiff takes or has taken for pain or other symptoms;

5. Treatment, other than medication, Plaintiff receives or has received for relief of her symptoms, including pain;

6. Any measures other than treatment the Plaintiff uses or has used to relieve her symptoms, including pain; and

7. Other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms.

Here, the ALJ reviewed Plaintiff's testimony at the hearing in conjunction with record evidence, and concluded that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms. (Tr. 19-20.) In finding that her complaints of pain and other symptoms were not entirely credible, however, the ALJ focused on the seven factors above, along with record medical evidence. In her brief to the Court, Plaintiff recounts her reports to the administrative agency regarding her activities of daily living and that these reports are consistent with her hearing testimony, and her reports to physicians and therapists. (Doc. No. 13 at 8-12.) She argues that according to SSR 96-7p, "consistency is a strong

indication of the credibility of an individual's statements and an adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances . . .." (Doc. No. 13 at 11.) She continues that statements made to treating or examining medical sources are especially important. (Id.) Although the Court recognizes that SSR 96-7p provides that consistency is a strong indication of credibility, it is only one indication of credibility. Further, it is not only the internal consistency of an individual's statements, but also the consistency between the individual's statements with other information in the case record. See SSR 96-7p. For instance, the ALJ must consider the degree to which Plaintiff's statements are consistent with medical signs and laboratory findings, and the consistency of Plaintiff's statements with other information in the case record including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. SSR 96-7p.

A longitudinal view of the record medical evidence, in conjunction with the seven factors listed above, reveals medical signs and laboratory findings, as well as reports and observations by other persons, that provide substantial record evidence to support the ALJ's finding on Plaintiff's credibility. As to Plaintiff's fall on the ice in January 2004, the discharge report from physical therapy indicated that she "returned to [her] previous home/work related chores with minimal to no pain." (Tr. 158.) Her therapist noted that she "had an excellent outcome as a result of this brief course of care." (Tr. 158.) In April 2006, Dr. Richards wrote to Dr. Sauter that he granted her short-term disability until a reevaluation and work up could be completed; however, he refused to grant her a further extension upon request, because he "did not feel there was anything objective that could support that." (Tr. 229.) Dr. Richards also reported to Dr.

Sauter that an MRI of the brain, B12, folate, and other labs were all unremarkable, and that her physical exam did not demonstrate any clear signs of upper motor neuron disease. He continued that at that time, her physical exam was fairly good with no obvious motor or sensory deficits. (Tr. 229.) Thereafter, Dr. Sauter recommended a cervical spine MRI which revealed mild osteophyte formation at C6-7, and nerve conduction studies for demyelination yielded normal results for upper and lower extremities. (Tr. 207, 279.) Plaintiff again began physical therapy in July 2006; after 19 aquatic sessions, Plaintiff reported that her pain level decreased. Plaintiff also reported that she used only over-the -counter Tylenol for pain at night, and sometimes during the day. (Tr. 35-36, 38.) After Plaintiff's injury to her left hand in a motor vehicle accident, Plaintiff reported minimal pain and that she was "doing everything" with her hand upon completion of nine occupational therapy treatments. She was discharged with 100% functional status. (Tr. 262-63.) During an office visit to Dr. Zayat on January 5, 2007, Plaintiff reported that her vertigo and neck pain had decreased. (Tr. 316.) She also had normal range of motion of the cervical spine. (Tr. 316.) Finally, in April 2007, Dr. Sauter, who had treated Plaintiff since June 2006, completed a Physical Capacities Evaluation form. (Tr. 283-87.) In addition to indicating that he believed Plaintiff could sit for up to eight hours, stand and walk up to six hours, lift 20 pounds frequently, use both hands for repetitive actions such as simple grasping, pushing, pulling, and fine manipulation, Dr. Sauter also indicated that he believed Plaintiff's pain was mild. (Tr. 283-84.) Finally, on this same form, Dr. Sauter indicated that Plaintiff's lumbar and cervical range of motion were normal but for some limitation noted with neck extension and rotation. His prognosis was good for full recovery. (Tr. 285-86.)

Plaintiff further argues that "to the extent that plaintiff's subjective factors may be

objectively measured and the possibility of symptom magnification or exaggeration minimized, this record contains such clinical findings which the ALJ should have *properly* considered." (Doc. No. 13 at 14) (emphasis in original). Plaintiff then lists various pages in the record. The Court has carefully reviewed all referenced pages and finds no support for Plaintiff's argument that the ALJ's credibility finding is not supported by substantial record evidence. For example, Tr. 160, cited by Plaintiff, is a record of Plaintiff's Physical Therapy <u>Initial</u> Evaluation of May 6, 2004 (emphasis added by Court). It does not reflect the "excellent outcome as a result of [the] brief course of care" that is reflected in the May 28, 2004 discharge report from the same physical therapy provider involving the same course of treatment. (Tr. 158.) Similarly, Tr. 292-93, cited by Plaintiff, is a Physical Therapy Initial Evaluation/Plan of Care; it does not reflect the Plaintiff's decrease in pain level reflected in progress reports subsequent to the Initial Evaluation. (<u>See</u> Tr. 290, 291.)

Finally, Plaintiff argues that although the "ALJ's decision did contain some specific reasons for his credibility findings, they were not, however, properly supported by the totality of the evidence in the case record." (Doc. No. 13 at 16.) Social Security Ruling (SSR) 96-7p requires an ALJ to articulate the reasons for his credibility findings. SSR 96-7p provides in relevant part as follows:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p.

Here, the ALJ stated specific reasons for his credibility determination supported by record evidence. Consequently, in light of all the above record evidence, his findings regarding Plaintiff's credibility are supported by substantial evidence.

      B.      <u>Evaluation of Plaintiff's Treating and Examining Sources pursuant to 20 C.F.R. §<br>404.1527 and 416.927, and SSR 96-2p.</u>

Although Plaintiff lists this argument as a contention of error under section IV of her Brief, she does develop it anywhere in her brief at Document No. 13. Consequently, the Court deems this assertion to be undeveloped and inadequate to raise this issue before the Court. <u>See Pennyslvania v. U.S. Dept. of Health & Human Servs.</u>, 101 F.3d 939, 945 (3d Cir. 1996) (stating that conclusory assertions, unaccompanied by substantial argument, will not suffice to bring an issue before the court), <u>cited in</u>, <u>Massie v. U.S. Depart. of Hous. & Urban Dev.</u>, 2007 WL 184827 (W.D. Pa. 2007), <u>order vacated in part on other grounds</u>, 2007 WL 674597 (W.D. Pa. 2007).

      C.      <u>The ALJ Properly Concluded that Plaintiff Does not have an Impairment or<br>Combination of Impairments that Meets or Medically Equals one of the Listed<br>Impairments.</u>

Plaintiff argues that the ALJ erred at step three of the five-step sequential evaluation. Relying on <u>Burnett v. Commissioner of Social Security</u>, 220 F.3d 112, 119-120 (3d Cir. 2000), Plaintiff argues that the ALJ's findings fall well below the minimal level of articulation required in finding that Plaintiff's severe impairments, alone or in combination, were not equivalent to

Listed impairments. (Doc. No. 13 at 17-18.) In Burnett, the United States Court of Appeals for

the Third Circuit found that the ALJ erred, when at step three, he indicated only the following:

> Although [Burnett] has established that she suffers from a severe musculoskeletal
> [impairment], said impairment failed to equal the level of severity of any
> disabling condition contained in Appendix 1, Subpart P of Social Security
> Regulations No. 4.

Burnett, 220 F.3d at 119. The Court of Appeals in Burnett indicated that the ALJ must set forth

the reasons for his decision at step three, and concluded that the above quoted language

prevented meaningful judicial review. Id. Consequently, the Court of Appeals remanded so that

the ALJ could explain his findings at step three. Id. at 120. Further, the ALJ in Burnett did not

consider the combined effects of Plaintiff's impairments to determine whether, in combination,

they were equivalent to a Listed impairment. Id. at 119.

Here, the ALJ identified five separate Listings, including Listings 1.04, 2.02, 2.04, 5.08,

and 11.00, et. al., that were potentially applicable to Plaintiff's circumstances. As to each

Listing, the ALJ specifically described why the record evidence did not fulfill the requirements

of each Listing. The ALJ considered the impairments in combination as well as individually.

(Tr. 17, Finding No. 4.)

Plaintiff raises an additional argument concerning step three. Plaintiff directs her

arguments to the ALJ's conclusions concerning Listing 11.00, and a Listing not considered by

the ALJ, Listing 1.02. Initially, as to Listing 11.00, Plaintiff argues that her diagnosed

meningioma (benign brain tumor), benign positional vertigo, migraine headache, optic neuritis,

restless leg syndrome (RLS), hand neuralgia/paresthesias, bilateral carpel tunnel syndrome,

cervical strain, cervicalgia, herniated disc disease, and lumbago, meet or are at least medically

equivalent in severity to the criteria listed in 11.00 et. al. Specifically, Plaintiff contends that the

record medical evidence reflects "disorganization of motor function, paresis[9], involuntary movement, and sensory disturbances which occur singly or in combination and result in sustained disturbance of gross and dexterous movements or gait and station." (Doc. No. 13 at 19.) A careful review of the record evidence demonstrates that Plaintiff's meningioma "was too small to cause any problem" (Tr. 277), that her benign positional vertigo had decreased by January 5, 2007 (Tr. 316), and that by April 25, 2007, she was complaining less of headaches to her treating physician (Tr. 287). Further, the Court can locate no record evidence demonstrating that Plaintiff experienced sustained disturbance of gross and dexterous movements or gait and station, nor does Plaintiff direct the Court to the same. In fact, most recent record evidence from her treating physician indicates that Plaintiff's lumbar range of motion was normal, and her cervical range of motion was normal other than some limitation noted with neck extension and rotation. (Tr. 285.) Further, as recently as January 5, 2007, her treating physician indicated that her gait was normal and no pronator drift was observed. (Tr. 316.) In addition, after nine occupational therapy treatments for her left hand injured in a motor vehicle accident, Plaintiff reported minimal pain, and that she was "doing everything" with her hand. (Tr. 262.) She was discharged from therapy with 100% functional status. (Tr. 263.)

Next, Plaintiff argues that the ALJ should have considered Listing 1.02. Listing 1.02, Major dysfunction of a joint(s) (due to any cause), requires proof of a gross anatomical deformity, chronic joint pain and stiffness, signs of limitation of motion of the affected joint, images of joint space narrowing, and an inability to ambulate effectively or an inability to perform fine and gross movements. Here, there is no record evidence of a gross anatomical

---

[9]Paresis is slight or incomplete paralysis. <u>Dorland's</u> at 1403.

deformity, and the Plaintiff has not directed the Court to the same.  Nor does the record evidence

demonstrate that Plaintiff is unable to ambulate effectively, as defined in 1.00B2b.  Likewise, the

record evidence does not demonstrate that Plaintiff is unable to perform fine and gross

movements as defined in 1.00B2c.  Instead, medical records from Plaintiff's treating physician

document that Plaintiff can stand and walk for up to six hours, lift 20 pounds frequently, use both

hands for repetitive actions such as simple grasping , pushing, pulling, and fine manipulation.

Consequently, the ALJ's findings at step three are supported by substantial evidence.


D.   The ALJ did not Err in his Characterization of Plaintiff's Residual Functional
     Capacity and his Hypothetical Questions to the Vocational Expert reflect the
     Specific Capacity/Limitations Established by the Record.

The United States Court of Appeals for the Third Circuit has held that "a hypothetical

question must reflect all of a claimant's impairments that are supported by the record; otherwise

the question is deficient and the expert's answer to it cannot be considered substantial evidence."

Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing Podedworny v. Harris, 745

F.2d 210 (3d Cir. 1984); Wallace v. Secretary, 722 F.2d 1150 (3d Cir. 1983)).  See also Plummer

v. Apfel, 186 F.3d 422, 431-32 (3d Cir. 1999) (applying Chrupcala to conclude that the VE's

testimony could be relied upon as substantial evidence that the plaintiff was not totally disabled

where the hypothetical question fairly set forth every credible limitation established by the

physical evidence).

The limitations in the ALJ's hypothetical here accurately convey all of Plaintiff's

limitations.  Specifically, the ALJ relied on Plaintiff's treating physician's "Physical Capacities

Evaluation" form completed in April 2007.  (Tr. 283-87.)  Therefore, the Commissioner's

ensuing decision is supported by substantial evidence.  See <u>Chrupcala</u>, 829 F.2d at 1276.


V.      <u>CONCLUSION</u>

For the reasons discussed above, Plaintiff's motion for summary judgment must be

denied.  Defendant's motion for summary judgment must be granted, and the decision of the

Commissioner of Social Security denying Plaintiff DIB and SSI affirmed.




<u>**ORDER**</u>

**AND NOW** this 18th day of March, 2009, it is hereby **ORDERED** that Plaintiff's Motion

for Summary Judgment is **DENIED.**  If is further **ORDERED** that Defendant's Motion for

Summary Judgment is **GRANTED**, and the decision of the Commissioner denying Plaintiff

Disability Insurance Benefits and Supplemental Security Income is **AFFIRMED**.




By the Court:


_____
LISA PUPO LENIHAN
United States Magistrate Judge


cc:     All Counsel of Record
        Via Electronic Mail